Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alberto L. Acarón Montalvo, Carlos R. Wiscovitch Teruel<br><br>        Recurridos<br><br>                v.<br><br>Departamento de Recursos Naturales y Ambientales<br><br>        Peticionarios | Certiorari<br><br>2012 TSPR 134<br><br>186 DPR ____ |

Número del Caso: CC-2011-523

Fecha: 28 de agosto de 2012

Tribunal de Apelaciones:

            Región Judicial de San Juan

Oficina del Procurador General:

            Lcdo. Luis Román Negrón
            Procurador General

            Lcda. Lizette Mejías Avilés
            Procuradora General Auxiliar

Abogados de la Parte Recurrida:

            Lcdo. Oscar Acarón Montalvo
            Lcdo. Luis Ortiz Guadalupe

Materia: Derecho Constitucional – Requisitos y Allanamientos

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alberto L. Acarón Montalvo,
Carlos R. Wiscovitch Teruel
        Recurridos                                    Certiorari

            v.

  Departamento de Recursos
  Naturales y Ambientales            CC-2011-0523
        Peticionarios


Opinión del tribunal emitida por el Juez Asociado señor Rivera García.


En San Juan, Puerto Rico, a 28 de agosto de 2012.

La Oficina del Procurador General, en representación del Departamento de Recursos Naturales y Ambientales de Puerto Rico (DRNA) (peticionaria), nos solicita que revoquemos la sentencia emitida por el Tribunal de Apelaciones el 28 de febrero de 2011. Mediante el referido dictamen se revocaron las multas que vigilantes de esa agencia le impusieron a los cazadores Alberto L. Acarón Montalvo y Carlos R. Wiscovitch (recurridos). Sostuvo el foro *a quo* que los vigilantes violaron la disposición constitucional que prohíbe los registros y allanamientos irrazonables, y además, que no existía prueba en

el expediente administrativo que sostuviera las faltas imputadas. Señala la peticionaria que era imperativo esgrimir como cuestión de umbral si los cazadores podían impugnar el allanamiento realizado. Examinado el recurso de autos, modificamos la sentencia del foro apelativo y, así modificada, confirmamos.

I

El 16 de noviembre de 2009 miembros del Cuerpo de Vigilantes del DRNA accedieron a la finca Toro Farms, sita en el municipio de Cabo Rojo, debido a una alegada[1] llamada telefónica que realizó el Sr. Milton Toro - dueño de esa finca- para denunciar la presencia de cazadores no autorizados en esta. Una vez allí, los vigilantes inspeccionaron las pertenencias de los recurridos y encontraron varias presas y armas de caza. En consecuencia, el vigilante Ricardo Rivera les expidió dos boletos de falta administrativa imponiéndoles el pago de una multa de $500 por cazar en una finca privada sin permiso del dueño.

Inconformes con tal proceder, los cazadores presentaron ante el DRNA sendos recursos de revisión de boletos, y a su vez, solicitaron que se celebrara una vista administrativa.[2] Impugnaron las multas impuestas y adujeron que poseían el aval del Sr. Milton Toro para cazar en la colindancia de Toro Farms. Sin embargo, a

---

[1] Según discutiremos más adelante, hubo controversia en cuanto a este hecho particular.
[2] Apéndice de la petición de certiorari, pág. 120.

pesar de manifestar lo anterior como parte de sus defensas, sostuvieron que cuando fueron intervenidos no estaban cazando en esa finca, sino en un terreno contiguo identificado como la Finca Ruiz. En ese contexto, alegaron que el allanamiento realizado por los Vigilantes fue ilegal ya que los vigilantes no contaban con la autorización del dueño de la finca Ruiz para irrumpir en ese predio, razón por la cual entendían que debía descartarse toda evidencia producto de dicha intervención e invalidarse las multas emitidas.

Así las cosas, se celebró la vista administrativa en la cual únicamente se desfiló prueba testimonial: el vigilante Ricardo Rivera atestiguó por la agencia y los dos recurridos en su propia defensa. Conviene destacar que durante la audiencia surgió una controversia en cuanto a la existencia de una querella que alegadamente había presentado el Sr. Milton Toro. No obstante, ninguna de las partes presentó a este último como su testigo.[3]

Luego de escuchar y aquilatar la prueba, la Oficial Examinadora emitió su informe y determinó, como cuestión de hecho, que el 15 de noviembre de 2009, el Sr. Milton Toro denunció al Centro de Mando del Cuerpo de Vigilantes

---

[3] Trascendió en la vista administrativa que para probar que se había presentado la querella, el representante del Departamento de Recursos Naturales y Ambientales (DRNA) ofreció únicamente la copia del documento que evidenciaba el recibimiento de la llamada del Sr. Milton Toro, razón por la cual la Oficial Examinadora no lo admitió como evidencia. Empero, el vigilante Rivera testificó sobre su conocimiento en cuanto a la llamada, aunque mencionó que no la había atendido personalmente. La importancia de esa querella radicaba en que era en esta que los Vigilantes se amparaban para sostener que estaban autorizados para entrar a la finca.

que unas personas se encontraban cazando en su propiedad sin su autorización. Añadió que, en respuesta a esa querella, los vigilantes se personaron a la finca Toro Farms, donde encontraron a los recurridos cazando. Además, determinó como un hecho probado que cuando los vigilantes les cuestionaron en cuanto a si ostentaban permiso del dueño para cazar allí, estos proveyeron la información de contacto del Sr. Milton Toro para que verificaran su anuencia. No obstante, ello no se pudo corroborar. Conforme a lo anterior, el DRNA resolvió acogiendo las determinaciones de hechos formuladas por la Oficial Examinadora y sostuvo la validez de los boletos expedidos.[4]

En desacuerdo con la decisión, los recurridos acudieron al Tribunal de Apelaciones[5] y argumentaron que en

---

[4] Por otra parte, la agencia dictaminó que los vigilantes podían entrar e inspeccionar la finca Toro Farms en virtud de las disposiciones legislativas que les permiten a las agencias administrativas inspeccionar y fiscalizar todas aquellas actividades que les compete regular. Esta interpretación fue descartada por el Tribunal de Apelaciones por no estar conforme con la jurisprudencia establecida en Blassini et als. v. Depto. Rec. Naturales, 176 D.P.R. 454 (2009), donde dispusimos que la caza deportiva no es una actividad estrechamente reglamentada por el Estado.

[5] En su recurso de revisión judicial señalaron los errores siguientes:

1. ERRÓ EL DRNA EN VISTA DE LOS HECHOS QUE LA EVIDENCIA OBTENIDA POR EL DRNA ES ADMISIBLE EN VIRTUD DE LA SECCIÓN 6.1 DE LA LEY DE PROCEDIMIENTOS ADMINISTRATIVOS UNIFORMES, 3 L.P.R.A. SEC. 2191
2. ERRÓ EL DRNA AL ENTENDER QUE EL CASO DE HCMA PR., INC ETC. V. CONTRALOR 133 D.P.R. 945 VALIDA EL REGISTRO ILEGAL POR PARTE DE LOS AGENTES DEL DRNA.
3. ERRÓ EL DRNA EN LA INTERPRETACIÓN Y APLICACIÓN DE LA DOCTRINA EN PUEBLO V. FERREIRA MORALES 147 D.P.R. 238 (1998).
4. ERRÓ EL DRNA AL ENTRAR A RESOLVER SOBRE LA EVIDENCIA ILEGALMENTE OBTENIDA POR AGENTES DEL DRNA SI EL FUNDAMENTO DESCANSA (SIC) SOBRE LA SECCIÓN 6.1 DE LA LEY DE PROCEDIMIENTO ADMINISTRATIVO UNIFORME (SUPRA) Y EL CASO DE PUEBLO VS. FERREIRA MORALES 147 DPR 238 (1998)
5. ERRÓ EL DRNA AL ADMITIR PRUEBA DE TODOS MODOS INADMISIBLE.

el expediente no obró prueba que sostuviera el proceder administrativo. Así también, arguyeron que el DRNA había errado al basar su determinación en evidencia inadmisible por considerar que esta era fruto de un registro ilegal. En respuesta, el DRNA expuso que los cazadores no tenían legitimación para presentar esa defensa.

Atendido el recurso, el foro *a quo* acogió parte de los planteamientos de los recurridos y revocó la resolución de la agencia. El tribunal intermedio razonó que el expediente administrativo no contenía evidencia sustancial que fundamentara la decisión del DRNA y añadió que el registro que se llevó a cabo fue ilegal puesto que no contó con una orden judicial al efecto ni se configuró ninguna de las excepciones que permiten a las agencias administrativas realizar un registro sin la venia judicial. En cuanto a la autorización predicada en la querella presentada, pronunció que el DRNA no logró demostrar la existencia de esa querella.[6] Por lo tanto, resolvió que los vigilantes entraron a la finca Toro Farms sin el consentimiento de su dueño. Al ser así, concluyó

---

6. ERRÓ EL DRNA AL PERMITIR VIOLAR EL DEBIDO PROCESO DE LEY EN EL PRESENTE CASO Y GANAR ACCESO A PRUEBA FUERA DEL REGISTRO.
7. ERRÓ EL DRNA EN LA CREACIÓN DE DERECHO O APLICACIÓN DE DERECHO POR ANALOGÍA
8. ERRÓ EL DRNA EN SU ARGUMENTACION SOBRE ASPECTOS DE DIFICULTAD PARA HACER SU TRABAJO. Apéndice de la Petición de *certiorari*, pág. 57.

[6] Durante la vista administrativa la Oficial Examinadora denegó la admisión en evidencia de la copia del documento que evidenciaba la querella presentada por el Sr. Milton Toro, por no ser el documento original. Así, pues, esta se propuso tomar conocimiento oficial del contenido del expediente administrativo. En cuanto a esto, el Tribunal de Apelaciones señaló que la Oficial Examinadora erró al proceder de esa manera, habida cuenta que la existencia de la querella era un hecho que se encontraba en controversia, por lo que no se podía tomar conocimiento oficial de este.

que estos transgredieron los derechos constitucionales de los recurridos y consecuentemente, invalidó los boletos emitidos.

No conteste con ese dictamen, comparece la peticionaria mediante el recurso de *certiorari* de epígrafe y señala:

> Erró el tribunal de Apelaciones al no considerar la controversia de umbral respecto a la ausencia de legitimación de los cazadores recurridos para impugnar la alegada entrada y registro ilegal, previo a adjudicar en los méritos la presunta ilegalidad.

El 21 de octubre de 2011 expedimos el auto solicitado. Con el beneficio de la comparecencia de ambas partes, pasamos a resolver la controversia que nos ocupa.

II

A. La Cuarta Enmienda de la Constitución de Estados Unidos, así como la Constitución de Puerto Rico, protegen el derecho del Pueblo contra la intromisión indebida y arbitraria del Estado en sus casas, papeles y efectos. Específicamente, la Cuarta Enmienda de la Constitución federal dispone:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Emda. IV, Const. EE. UU., U.S.C. ed. 2004, pág. 210.

Por su parte, la Constitución de Puerto Rico amplía[7] esta protección estableciendo como sigue:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> No se interceptará la comunicación telefónica.
> Solo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.[8]

En nuestro ordenamiento jurídico, esta protección constitucional se considera un valor comunitario de indiscutible jerarquía y, según hemos hilvanado jurisprudencialmente, consagra varios propósitos fundamentales. Pueblo v. Valenzuela Morel, 158 D.P.R. 526 (2003).[9] Uno de estos propósitos es disuadir y desalentar a los funcionarios del orden público de incurrir en conducta que viole esta disposición, para así preservar la integridad judicial y evitar la complicidad de los tribunales con respecto a actos de desobediencia a la Constitución. Id. pág. 539. De igual forma, encarna el principio de impedir al ente gubernamental beneficiarse de sus actos ilícitos, pues lo contrario

---

[7] Se cataloga la Constitución de Puerto Rico como una de "factura más ancha". Véase, E.L. Chiesa, Los derechos de los acusados y la factura mas ancha, (Núm. 1) 65 Rev. Jur. U.P.R. 82 (1996).
[8] Art. 2, Sec. 10., Const. E.L.A., L.P.R.A. Tomo 1.
[9] Véanse, también: Toll y Sucn. Rivera Rojas v. Adorno Medina, 130 D.P.R. 352, 358-59 (1992); E.L. Chiesa, Derecho procesal penal de Puerto Rico y Estados Unidos, Forum, 1991, Vol. 1, Sec. 6.2, pág. 285.

resultaría en un menoscabo de la confianza de la ciudadanía en las instituciones que le gobiernan. Id.

En consonancia con la Carta de Derechos de nuestra Constitución, es un axioma jurídico que todo registro que se efectúe sin una orden judicial se presume irrazonable correspondiéndole entonces al Estado demostrar su validez. Blassini et als. v. Depto. Rec. Naturales, 176 D.P.R. 454, 462 (2009); Pueblo v. Serrano Reyes, 176 D.P.R. 437, 449 (2009); E.L. Chiesa, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Colombia, Forum, 1991, Vol. 1, Sec. 6.1, pág. 281. Así, la regla general es que todo registro, allanamiento o incautación que se realice, no importa su índole penal o administrativa, es irrazonable *per se* de llevarse a cabo sin orden judicial previa. E.L.A. v. Coca Cola Bott. Co., 115 D.P.R. 197, 207 (1984). La evidencia obtenida en contravención a la cláusula constitucional aludida no tendrá acceso a los tribunales. En otras palabras, la prueba que los funcionarios del Estado hayan recopilado mediante un registro, allanamiento o incautación realizada en contravención al mandato constitucional será inadmisible para probar la comisión de un acto delictivo. Pueblo v. Serrano Reyes, supra; Blassini et als. v. Depto. Rec. Naturales, supra. La presencia expresa de esta regla de exclusión en la Constitución de Puerto Rico tiene el efecto inmediato de que no puede ser abolida por la jurisprudencia ni por la Asamblea Legislativa ya que para

ello se necesitaría una enmienda constitucional. E.L. Chiesa, Derecho Procesal penal: etapa investigativa, Publicaciones JTS, San Juan, Puerto Rico, 2006, pág. 118.

Ahora bien, es preciso que examinemos cuándo se configura un registro, una incautación o un allanamiento que viole el derecho de la ciudadanía a la protección de su persona, casas y papeles. Para responder tal interrogante es imperativo atender las instancias en que una persona está tutelada para reclamar el mencionado derecho.

Años atrás, en la jurisdicción federal prevalecía la percepción de que el precepto constitucional que prohíbe los registros y allanamientos irrazonables salvaguardaba únicamente el interés que las personas poseían sobre su propiedad, fundamentándose en el concepto de "trespass" o de penetración en el lugar protegido[10]. Posteriormente, en la decisión de Katz v. United States, 389 U.S. 347, 351 (1967), el Tribunal Supremo de Estados Unidos encauzó su análisis a determinar que la Cuarta Enmienda de la Constitución federal no protegía a los lugares sino a las personas, siempre y cuando estas exhibieran una expectativa razonable de privacidad[11] en cuanto al bien o

---

[10] Véase: United States v. Jones, 132 S. Ct. 945, 181 L. Ed. 2d 911, 565 U.S.___ (2012); E.L. Chiesa, Derecho Procesal penal, Etapa Investigativa, San Juan, JTS, Puerto Rico, 2006, págs. 102-108.

[11] La jurisprudencia puertorriqueña utiliza en ocasiones el término "privacidad" e "intimidad" como sinónimos. En la jurisdicción de Estados Unidos se utiliza el termino "privacy" de manera uniforme. Véase: J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos. Bogotá, Ed. Temis, 2009, pág. 694.

lugar en que intervino el Estado.[12]  No obstante, en
United States v. Jones, 132 S. Ct. 945,  181 L. Ed. 2d
911, 565 U.S.___ (2012), se aclaró recientemente que Katz
no pretendió rechazar el planteamiento de que la Cuarta
Enmienda también protegía el derecho de las personas
contra la intromisión física de los agentes del Estado en
determinada propiedad.  El Tribunal explicó que, más
bien, el derecho a la intimidad no era el único interés
albergado.[13]

En Puerto Rico hemos resuelto que la cláusula
constitucional que prohíbe los registros y allanamientos
irrazonables ampara la intimidad de los seres humanos.[14]
Pueblo v. Díaz, Bonano, 176 D.P.R. 601, 613 (2009);
Rullán v. Fas Alzamora, 166 D.P.R. 742, 772 (2006);
E.L.A. v. Coca Cola Bottling Co, supra.  Similar enfoque
está arraigado en Puerto Rico ya desde la confección de
nuestra Constitución.  Así surge de las expresiones de la
Comisión de la Carta de Derechos de la Convención

---

[12] Este análisis surge de la opinión concurrente del Juez Harlan en ese caso.

[13] En este caso se mencionó lo siguiente: "a trespass on "houses" or "effects," or a Katz invasion of privacy, is not alone a search unless it is done to obtain information; and the obtaining of information is not alone a search unless it is achieved by such a trespass or invasion of privacy".  United States v. Jones, supra, esc.5.

[14] Téngase presente que en Puerto Rico el derecho a la intimidad es consustancial a la declaración constitucional relativa a la inviolabilidad de la dignidad del ser humano establecida en la Sec. 1 del Art. II de la Constitución de Puerto Rico y en la Sec. 8 del Art. II que dispone que toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. En ese sentido, la protección constitucional contra los registros y allanamientos irrazonables surge también de ambas secciones. Pueblo v. Soto Soto. 168 D.P.R. 46, 53, esc. 5, (2006); Rullán v. Fas Alzamora, 166 D.P.R. 742, 770-771 (2006).

Constituyente cuando, al explicar la Sec. 10 del Art. II de la Constitución, L.P.R.A., Tomo 1, razonó como sigue:

> La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano son como una prolongación de su persona, pues constituyen el ámbito en que ésta se ha hecho y se mantiene. Toda intromisión sin su permiso en este círculo privado equivale para todo hombre a una violación de su personalidad. Lo mismo acontece con los medios en que se expresa su intimidad y que reserva tan sólo para algunos: su correspondencia, sus manifestaciones espontáneas a través de los modernos medios mecánicos de comunicación. La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona.[15]

En armonía con lo anterior, hemos reconocido que la protección constitucional en discusión se extiende a la vida íntima y a la santidad del hogar, comprendiendo lo que se ha denominado como "una prolongación de la persona", protegiendo a ambas y no a la propiedad en sí. Pueblo v. Valenzuela Morel, supra, pág. 538. Véase además: O.E. Resumil de Sanfilippo, Practica jurídica de Puerto Rico: derecho procesal penal, Oxford, Ed. Equity, 1990, T.#1, Vol.#1, pág. 205. En otras palabras, determinamos que la cláusula constitucional que veda los registros y allanamientos irrazonables por parte del Estado "no entraña un derecho propietario". Pueblo v. Valenzuela Morel, supra, pág. 539. Véase además Pueblo v. Vargas Delgado, 105 D.P.R. 335 (1976).

---

[15] 4 Diario de Sesiones de la Convención Constituyente 2567-2568 (1952).

En ese contexto, siguiendo el raciocinio de Katz, para que un individuo pueda reclamar el resguardo que le ofrece la Sec. 10 del Art. II de nuestra Carta de Derechos, *supra*, es necesario que albergue una expectativa razonable de intimidad sobre el objeto o lugar que ha sido registrado o allanado; es decir, que exista un interés personal sobre las propiedades de que se trate. Véase Pueblo v. Díaz, Bonano, supra, pág. 612 y casos allí citados. Es por ello que el mero hecho de que el Estado intervenga con un ciudadano no activa automáticamente la protección constitucional. Con ese fin, es inexorablemente necesario comprobar si el individuo que alega haber sido afectado alberga un interés personal de tal envergadura. Blassini et als. v. Depto. Rec. Naturales, supra, pág. 464. Con ese marco doctrinal, examinemos los preceptos que deben analizarse para descifrar cuándo se posee dicha expectativa.

En primer lugar, una expectativa razonable de intimidad implica que la persona haya exhibido una expectativa subjetiva de intimidad; no una simple reserva mental, sino una conducta de actos afirmativos que demuestren de manera inequívoca la intención de alojar dicha expectativa. Pueblo v. Ortiz Rodríguez, 147 D.P.R. 433, 442 (1999).[16] En segunda instancia, la sociedad tiene

---

[16] Véanse además: Pueblo v. Bonilla, 149 D.P.R. 318 (1999); Pueblo v. Rivera Colón, 128 D.P.R. 672 (1991); Pueblo v. Lunzón, 113 D.P.R. 315 (1982); U.S. v. Dunn, 480 U.S. 294 (1987).

que reconocer esa expectativa individual como razonable. Id.

Como pertinente a la controversia que atendemos, igualmente se ha señalado que los ocupantes que se encuentren legítimamente en una propiedad cuando se registra o allana -tales como inquilinos, visitantes del dueño de una residencia o quienes pernoctan en un cuarto de hotel- albergan una expectativa razonable de privacidad en dicho lugar. Véase 6 W.L. LaFave, Search and Seizure: a treatise on the Fourth Amendment, Sec. 11.3(a), págs. 132-133. Sobre ello, en Pueblo v. Ramos Santos, 132 D.P.R. 363, 774 (2006), acogimos las expresiones pronunciadas por el Tribunal Supremo de Estados Unidos en Minnesota v. Olson, 495 U.S. 91 (1990), respecto a los visitantes:

> We stay in others homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

Contrario es el caso de quien se encuentra ilegalmente en una propiedad. En ese caso hemos resuelto que no se alberga expectativa de intimidad alguna. Pueblo v. Ramos Santos, supra, págs. 371-372. Ante esa situación, correspondería entonces al agraviado demostrar que se encontraba legalmente en el lugar registrado o allanado. Id. Recordemos que dos de los criterios para

evaluar si alguien ostenta una expectativa razonable de intimidad sobre una propiedad particular es determinar si esta persona tiene acceso legítimo a la propiedad y si puede excluir a los demás de su uso. Rawlings v. Kentucky, 448 U.S. 98 (1980); Rakas v. Illinois, 439 U.S. 128 (1978). Véase también, Resumil de Sanfilippo, op. cit., págs. 315-316.[17]

Hemos visto que en referencia a lugares, la Constitución protege a las personas que abrigan un interés personal o una expectativa de intimidad razonable, según lo reconozca la sociedad. Ahora bien, nos resta exponer quién tiene la prerrogativa de solicitar la supresión de evidencia fundamentándose en que ocurrió un registro y allanamiento irrazonables.

Nos señala el profesor Chiesa Aponte que solo a quien se le ha violado el derecho constitucional a la protección contra detenciones, registros o incautaciones irrazonables, puede invocar la regla de exclusión, ya que este es el remedio a la disposición de quien sufre la violación de su derecho constitucional. E.L. Chiesa, Los derechos de los acusados y la factura más ancha, (Núm.1)

---

[17] Otros de los criterios son:

1. Si el lugar registrado es uno donde una persona prudente y razonable puede esperar que esté exenta de intrusión gubernamental.
2. Si la persona ha tomado algunas medidas o precauciones para mantener su privacidad en el lugar registrado.
3. Si la persona razonablemente espera estar protegida en su intimidad en el lugar registrado.

65 Rev. Jur. U.P.R. 82, 128 (1996).[18]  Así lo establecimos

en Pueblo v. Ramos Santos, supra, pág. 374, cuando

enunciamos que bajo los hechos particulares de ese caso,

[e]l acusado no tenía legitimación activa para solicitar

(la) supresión, pues carecía de una expectativa legítima

de privacidad". (Subrayado nuestro).  Esa conclusión es

consecuente con las expresiones consignadas en el Informe

de la Comisión de la Carta de Derechos de la Convención

Constituyente, cuando al emitir sus posturas concernientes

a la Sec. 10 del Art. II de la Carta de Derechos de la

Constitución de Puerto Rico, supra, aludió al derecho en

discusión como un derecho que es personal.[19] De la misma

forma se pronunció el Tribunal Supremo de Estados Unidos,

refiriéndose a la Cuarta Enmienda de la Constitución

federal:

> Fourth amendment rights are personal rights
> which, like some other constitutional rights,
> may not be vicariously asserted.  A person who
> is aggrieved by an illegal search and seizure
> only through the introduction of damaging
> evidence secured by a search of a third person's
> premises or property has not had any of his
> Fourth Amendment rights infringed. Since the
> exclusionary rule is an attempt to effectuate
> the guarantes of U.S. Const. amend. IV, it is
> proper to permit only defendants whose Fourth
> Amendment rights have been violated to benefit
> from the rule's protections. (Citas internas
> omitidas)[20]

---

[18]Véase, también, D. Nevares Muñiz, Sumario de derecho procesal penal puertorriqueño, 9na. ed. Rev. San Juan, Instituto para el Desarrollo del Derecho, (2011), Sec. 7.38, pág. 87.

[19] En el informe se menciona que "[l]as garantías personales frente al arresto, el registro, la incautación y el allanamiento tienen su límite en la conducta criminal". Diario de Sesiones, supra, pág. 2567.

[20] Rakas v. Illinois, 439 U.S. 128, 134 (1978).

Es decir, el derecho a la supresión de evidencia fundamentado en las consideraciones constitucionales expuestas es un derecho personal que solo puede invocarlo su titular. En Puerto Rico, "no hay factura más ancha en cuanto a la exigencia de standing". Chiesa, supra, 129. [21] Así, hemos puntualizado que

> [e]s esta expectativa razonable de intimidad la que es protegida por la disposición constitucional. Por esto, si estamos ante la intervención del Estado con el individuo, *hay que determinar si la persona, en efecto, tiene el derecho de abrigar la expectativa razonable de que su intimidad sea respetada para que entonces sea acreedor de la protección constitucional.* (Énfasis suplido) Rullán v. Fas Alzamora, supra, pág. 772.

Esto "constituye la piedra de toque de esta doctrina constitucional". Pueblo v. Soto Soto, 168 D.P.R. 46, 55 (2006).

Evidentemente, una de las virtudes que confiere ser acreedor de los derechos que otorga la protección contra los registros y allanamientos irrazonables es solicitar que se excluya la evidencia obtenida en contravención a la protección misma.

B. Ya adelantamos que en nuestro ordenamiento jurídico pueden ocurrir inspecciones o registros, tanto de índole penal como administrativa. Una inspección administrativa es aquella que se perpetra a través de la presencia física de un funcionario administrativo en la propiedad privada de una persona natural o jurídica que se

---

[21] Véase, Chiesa, Derecho procesal penal de Puerto Rico y Estados Unidos, op. Cit., pág. 315.

dedique a una actividad o negocio regulado por el Estado. Blassini et als. v. Depto. Rec. Naturales, supra, pág. 493. Conforme a la sección 6.1 de la referida Ley Núm. 170, *supra,* (3 L.P.R.A. sec. 2191), se le confirió a las agencias administrativas potestad de realizar inspecciones a fin de asegurarse del cumplimiento de las leyes y los reglamentos que administran, así como de las resoluciones, órdenes y autorizaciones que expidan sin previa orden de registro o allanamiento, únicamente en los siguientes casos:

> (a) En casos de emergencias, o que afecten la seguridad o salud pública;
> (b) al amparo de las facultades de licenciamiento, concesión de franquicias, permisos u otras similares;
> (c) en casos en que la información es obtenible a simple vista o en sitios públicos por mera observación.

Como observamos, el estatuto enumeró taxativamente las instancias en que una agencia administrativa puede efectuar un registro sin una orden previa. No obstante, es conocido que estas tienen la potestad de promulgar reglamentos para regir las encomiendas que se les delegó, claro está, dentro del marco de lo estatuido en la precitada ley.[22]

Concerniente al recurso que hoy atendemos, el DRNA es la agencia responsable de implementar la política pública contenida en la Sec. 19 del Art. IV de la Constitución de

---

[22] Véase Sec. 1.2 de la Ley Núm. 170-1998 (3 L.P.R.A. sec. 2101)

Puerto Rico.[23] Para que pudiera cumplir su cometido, la Ley Núm. 1-1977, Ley de Vigilantes de Recursos Naturales y Ambientales del Departamento de Recursos Naturales y Ambientales, 12 L.P.R.A. sec. 1201 *et seq.*, creó en el DRNA un organismo con funciones de supervisión, protección, conservación, defensa y salvaguarda de los recursos naturales. Esta pieza legislativa amplió, a su vez, la facultad fiscalizadora del DRNA al consignar en su Art. 5(b)(2) que el Cuerpo de Vigilantes tiene la facultad de arrestar por tentativa o violación a las leyes que administra --cuando ello se haya cometido en su presencia--aplicando en ese sentido las leyes que regulan a los agentes del orden público.[24] Además, y de notable importancia a la controversia que atendemos, se postula que estos funcionarios podrán entrar en propiedades y aguas del Estado sin que ello constituya trasgresión. Empero, la entrada a propiedades privadas requiere indefectiblemente el permiso previo del dueño del terreno, excepto en los casos que establece la Sec. 6.1 de la Ley Núm. 170, *supra*, a la cual nos referimos inicialmente.

---

[23] Según dispone el Artículo 3 de la Ley Orgánica del Departamento de Recursos Naturales y Ambientales, Ley Núm. 23-1972 (3 L.P.R.A. sec. 151, 153). Esta disposición constitucional preceptúa:

"Será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad; la conservación y mantenimiento de los edificios y lugares que sean declarados de valor histórico o artístico por la Asamblea Legislativa; reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social."

Es trascendental acentuar que estos registros administrativos o "reglamentarios" también se encuentran delimitados por la normativa atinente a los registros y allanamientos irrazonables. Véase, Blassini et als. v. Depto. Rec. Naturales, supra. El hecho de que en una agencia administrativa se tramiten procedimientos de manera más flexible no es razón para obviar dichos mandamientos de arraigo constitucional. D. Fernández Quiñonez, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da. ed., Colombia, Ed. Forum, 2001, págs. 227-228. Acorde con ello, la necesidad de que los vigilantes cuenten con el permiso previo del dueño para poder irrumpir en una finca privada tiene el propósito de salvaguardar la constitucionalidad de las acciones fiscalizadoras del DRNA. Blassini et als. v. Depto. Rec. Naturales, supra, pág. 469. Así, por ejemplo, en el antedicho caso se presentó una controversia un tanto similar a la que hoy nos ocupa, y establecimos que los vigilantes del DRNA no pueden intervenir con los cazadores en cualquier tiempo y lugar, sino que para ello es necesario que los vigilantes tengan derecho a estar en el lugar en que intervienen con los cazadores. Id, pág. 470. Es por eso que la entrada de los vigilantes a una propiedad privada sin el consentimiento previo del dueño, sin una orden judicial previa o sin que se cumpla con los requisitos establecidos en el Art. 6.1 de la Ley Núm. 170,

---

[24] Véase 12 L.P.R.A. sec. 1205 (b)(2).

supra, está vedada en nuestro ordenamiento jurídico. Blassini et als. v. Depto. Rec. Naturales, supra, pág. 474.

C. La Ley Núm. 170, supra, también regula lo concerniente al procedimiento adjudicativo que se lleva a cabo ante las agencias administrativas. Ciertamente, aunque estos procesos se caracterizan por ser flexibles y económicos, les son oponibles las garantías mínimas que exige el debido proceso de ley, toda vez que las decisiones administrativas tienen el alcance de afectar los intereses propietarios o libertarios de las personas. Com. Seg. v. Real Legacy Assurance, 179 D.P.R. 692, 706 (2010); Almonte et als. v. Brito, 156 D.P.R. 475, 481 (2002). Ello debe ser así ya que una vista administrativa es el equivalente a un juicio en los tribunales, por lo que inexorablemente debe ajustarse al requisito fundamental de que sea un proceso justo, tal como se ha conducido en los foros adjudicativos desde antaño. Com. Seguros v. Real Legacy Assurance, supra, pág. 707.[25] Así pues, con el fin de hallar la verdad y hacer justicia en todo proceso adjudicativo formal se vindicarán, entre otros, el derecho a ser oído y presentar prueba oral y escrita, a confrontarse con los testigos, a obtener una adjudicación imparcial y a que la decisión se base en el

_____

[25] Citando a B. Swartz, Administrative Law, 3ra ed., Boston, Ed. Little Brown, 1991, pág. 311 y a D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed. rev., Bogotá, Ed. Forum, 2001, pág. 155.

expediente.[26] Sec. 3.1 de la Ley Núm. 170 (3 L.P.R.A. sec. 2151); Magriz v. Empresas Nativas, 143 D.P.R. 63 (1997). Amerita recalcar que el expediente de la agencia constituirá la base exclusiva para la decisión del procedimiento adjudicativo, así como para una posterior revisión. Sec. 3.18 de la Ley Núm. 170. (3 L.P.R.A. sec. 2169).

Por su parte, en el caso que nos ocupa, el DRNA adoptó el Reglamento Núm. 6442, conocido como el Reglamento de Procedimientos Administrativos del DRNA.[27] Este, en su Artículo 27.7, dispone que durante una vista administrativa el representante del interés público tiene la responsabilidad de probar que la violación imputada ocurrió según se alegó en la orden o querella que dio lugar al procedimiento. Id. Además de esto, la agencia tiene la carga de probar que la penalidad aplicada es la apropiada. Id. Así pues, una vez se haya establecido un caso *prima facie* contra el querellado, este último tiene la responsabilidad de presentar y sostener cualquier defensa a su favor. Id.

Por último, nos resta exponer la delimitación de nuestra facultad revisora en cuanto a las decisiones administrativas. Como regla general, al revisar la decisión daremos deferencia a las determinaciones de

---

[26] El "expediente" comprende los documentos que no hayan sido materia exenta de divulgación por una ley y otros materiales relacionados con un asunto que esté o haya estado ante la consideración de la agencia. 3 L.P.R.A. sec. 2102 (c).
[27] Reglamento Núm. 6442 de 26 de abril de 2002.

hecho razonables de la agencia, esto es, que estén sustentadas con evidencia sustancial. Sec. 4.5 de la Ley Núm. 170 (3. L.P.R.A. 2175); Véase, también, Otero v. Toyota, 163 D.P.R. 716 (2005). Tengamos presente que *evidencia sustancial* es aquella que una mente razonable podría aceptar como adecuada para sostener una conclusión. Id. El propósito principal de esta doctrina es evitar sustituir el criterio del organismo administrativo especializado por el del foro judicial revisor. Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592,615 (2006); P.C.M.E. v. J.C.A., 166 D.P.R. 599, 615 (2005). No obstante, tal deferencia cede cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación de la ley, y (3) ha mediado una actuación irrazonable o ilegal. Otero v. Toyota, supra, pág. 729. En caso de que no nos encontremos ante alguna de estas situaciones, aunque exista más de una interpretación razonable de los hechos, se debe sostener la que seleccionó la agencia concernida. Id. Sin embargo, podemos revisar las conclusiones de derecho en todos sus aspectos. Sec. 4.5 de la Ley Núm. 170, supra. Empero, en ese ejercicio, es imperioso otorgar gran peso y deferencia a las interpretaciones que realiza una agencia en cuanto a los reglamentos y leyes que administra. Hernández, Álvarez v. Centro Unido, supra, pág. 615. Al ser así, si la interpretación legal concebida es razonable, debemos acatarla, cosa que no

ocurrirá en caso de que el organismo administrativo: (1) haya errado en la interpretación de la ley; (2) actúe arbitraria, irrazonable o ilegalmente, o (3) lesione los derechos constitucionales fundamentales de los ciudadanos. Hernández, Álvarez v. Centro Unido, supra, pág. 616.

III

En el presente caso se cuestiona la legitimación de los recurridos para alegar que se infringieron sus derechos constitucionales, fundamentándose en la protección contra los registros y allanamientos irrazonables. Sostiene el Estado que el foro apelativo debió pasar juicio sobre ese asunto antes de dirimir los méritos de la controversia.

Como discutimos, la prohibición a los Vigilantes del DRNA, en cuanto a que no pueden acceder a fincas privadas sin el consentimiento del dueño, existe para vindicar el derecho constitucional de las personas contra los registros y allanamientos irrazonables. Por lo tanto, al ser esto así, se deduce que cualquier defensa que se presente para impugnar las actuaciones de los vigilantes, cuya base sea el quebrantamiento de dicho derecho, debe ir enmarcada dentro del desarrollo jurisprudencial referente a esta garantía constitucional. Así pues, si bien resolvimos en Blassini, et als., que los vigilantes deben tener derecho a estar en el lugar en que intervienen con los cazadores, no toda persona está legitimada para

presentar una defensa basada en que estos penetraron una finca privada sin permiso del dueño. Arribamos a tal conclusión toda vez que, según expusimos, la cláusula constitucional que protege a los ciudadanos contra los registros y allanamientos irrazonables protege el derecho de intimidad que posea el agraviado en el lugar que ha sido registrado o allanado. Esto significa que solo tal persona es acreedora de exigir lo que la Sec. 10 del Art. II de nuestra Constitución concede, esto es, la exclusión en un procedimiento judicial de toda evidencia que tenga relación con la intervención ilegal del Estado.

El caso que nos ocupa no presenta un cuadro conforme a las doctrinas esbozadas. Nótese que aquí los recurridos lo que alegan es que los vigilantes no tenían permiso para entrar a la finca donde fueron intervenidos. En los procedimientos ante la agencia, los recurridos no ofrecieron prueba suficiente para demostrar que poseían expectativa de intimidad alguna sobre la finca Toro Farms. Si bien la jurisprudencia reconoce que en virtud de la garantía constitucional contra los registros y allanamientos irrazonables un visitante tiene la expectativa de que su intimidad no será perturbada por personas ajenas a su anfitrión,[28] los cazadores recurridos no lograron convencer a la agencia administrativa de que estaban en esa finca con la anuencia de su dueño. Veamos.

---

[28] Pueblo v. Ramos Santos, 132 D.P.R. 363, 372 (1992).

El Reglamento Núm. 6765 del DRNA, conocido como el Reglamento para Regir la Conservación y el Manejo de la Vida Silvestre, las Especies Exóticas y la Caza,[29] prohíbe cazar en fincas privadas sin el permiso del dueño y añade que el cazador deberá proveer información sobre el nombre, número de teléfono y lugar donde se pueda contactar al dueño o a la persona que le autorizó, de manera que dicha autorización se pueda corroborar posteriormente. Según el testimonio del vigilante Rivera, la autorización de los recurridos para cazar en Toro Farms nunca pudo corroborarse. En la vista este atestiguó:

> "De la misma finca, de la misma finca, procedemos a comunicarnos con el señor Toro, como es información corroborable, nosotros procedemos a llamarlo a él y él indica que no ha autorizado a nadie. Por eso es que yo procedo a expedir los boletos. Porque él no autorizó a nadie."[30]

Los recurridos atestiguaron lo contrario, pero no nos encontramos en posición de sustituir el criterio del DRNA en cuanto a la credibilidad que la agencia le otorgó a sus testimonios. La decisión de la agencia en cuanto a esta determinación de hechos en particular no fue irrazonable ni arbitraria, por lo que le damos deferencia. Recuérdese que el Sr. Milton Toro, alegado dueño de la finca, tampoco fue llevado a la audiencia para que ofreciera su versión de los hechos. De esta manera es ineludible la conclusión de que los recurridos no eran personas con un interés

---

[29] Reglamento Núm. 6765 del Departamento de Estado, 11 de febrero de 2004.
[30] Transcripción de la vista administrativa del 29 de mayo de 2009, CD. #1, pág. 25. Petición de *certiorari,* pág. 475.

protegido sobre ese predio. En este caso los vigilantes entraron a la finca Toro Farms, sobre la cual los recurridos no demostraron albergar ningún tipo de interés o expectativa de intimidad al no probar que se encontraban legítimamente allí.[31] Por lo tanto, la conducta de dichos agentes no comprometió ninguna expectativa razonable de intimidad alojada por los recurridos. De igual manera, estos tampoco demostraron poseer control, dominio o posesión legítima sobre la finca Toro Farms de manera que el Estado estuviera impedido de invadirla sin su previo consentimiento o sin que se emitiera una orden judicial al efecto.

Concluido lo anterior, y teniendo en cuenta que una persona que se encuentre ilegalmente en un lugar no tiene expectativa razonable de intimidad que se deba proteger, es forzoso colegir que el Tribunal de Apelaciones erró al concluir que los recurridos podían presentar una defensa amparada en la disposición constitucional que prohíbe los registros y allanamientos irrazonables, ya que no tenían legitimación para presentarla. Si bien hemos colegido que le asiste la razón a la peticionaria en cuanto a ese aspecto, lo anterior no dispone de la controversia. La Oficina del Procurador General también nos solicita que,

---

[31] Durante la vista administrativa, los recurridos testificaron que los Vigilantes registraron sus bultos y pertenencias. No obstante, su contención principal versaba sobre la autoridad de los vigilantes para entrar a la finca en la que fueron intervenidos. Aun así, de su propio testimonio surge que si bien en un principio cuestionaron el registro que se llevó a cabo en cuanto a sus efectos, posteriormente, estos consintieron a este. Véase Transcripción de la vista administrativa del 10 de febrero de 2009, CD #1, pág. 12, Petición de *certiorari*, pág. 363.

conforme a esa conclusión, revoquemos en su totalidad la sentencia del foro apelativo. Sin embargo, como veremos, ello no es suficiente para acceder a lo solicitado. El hecho de que los recurridos no pudieran presentar esa defensa no significa que estuvieran impedidos de litigar su caso ante el DRNA.

En la controversia que nos ocupa se imputó a los recurridos cometer la falta de cazar en una finca privada sin el permiso del dueño. Conforme al Reglamento de Procedimientos Administrativos del DRNA, la agencia tenía el peso de la prueba para sostener las sanciones impuestas a los cazadores. Es decir, una vez los recurridos impugnaron los boletos, le incumbía al representante del interés público presentar prueba preponderante para sostener la validez de las faltas administrativas imputadas. La Nueva Ley de Vida Silvestre, Ley Núm. 242, supra, define "caza deportiva" en su Art. 1.07 como la "[a]ctividad recreativa autorizada por el Secretario en la cual el participante, llamado cazador deportivo, utiliza un arma para hacer presa un animal de caza durante las temporadas establecidas por el Secretario".[32] Por lo tanto, era indispensable que se presentara prueba referente a que los recurridos incurrieron en dicha actividad en la finca de la cual fueron interceptados por los vigilantes, esto, a fin de que se pudiera establecer un caso prima facie en su contra.

---

[32] 12 L.P.R.A. sec. 107 (d).

Como sabemos, en los procedimientos adjudicativos que se llevan a cabo en las agencias administrativas no aplican las reglas de evidencia de la manera en que operan en los tribunales, pero, los principios fundamentales de estas se podrán utilizar para lograr una solución más rápida y económica de la controversia. Véase sec. 3.13 (f) de la Ley Núm. 170, *supra,* (3 L.P.R.A. sec. 2163(f)). Así también lo establece el Reglamento de Procedimientos Administrativos del DRNA en su Artículo 27.3c.[33]

Un principio recogido en la Regla 110 (H) de las Reglas de Evidencia de Puerto Rico es que un hecho puede probarse ya sea mediante evidencia directa o evidencia circunstancial. 32 L.P.R.A. Ap. VI R. 110 (H). Esa disposición establece que:

> Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Evidencia directa es aquélla que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente. Evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual por sí o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia.

Como bien menciona esta regla, la evidencia directa es aquella que prueba el hecho en controversia sin que medie inferencia o presunción, y que de ser cierta, demuestra el hecho de modo concluyente. En palabras del Profesor

---

[33] Esta disposición preceptúa que las Reglas de Evidencia no serán aplicables a las vistas administrativas pero que los principios fundamentales de evidencia se podrán utilizar para lograr una solución rápida, justa y económica del procedimiento.

Chiesa, este tipo de evidencia se refiere a aquella que de ser creída por el juzgador establece el hecho a ser probado sin ulterior consideración. E. L. Chiesa, Reglas de Evidencia de Puerto Rico 2009, San Juan, JTS, pág. 102. Por otro lado, la característica fundamental de la prueba circunstancial es que aunque fuera creída, no es por sí suficiente para probar el hecho que se aspiraba probar con esa prueba. Admor. F.S.E. v. Almacén Ramón Rosa, 151 D.P.R. 711, 719 (2000). Más bien, en esos casos se requiere un proceso de inferencias razonables o razonamiento basado en la experiencia, lo que en unión a otra evidencia, podría llevar al juzgador a concluir que ocurrió un hecho particular. Id. Se ha reconocido que la prueba circunstancial es intrínsecamente igual que la prueba directa y, por lo tanto, se evalúan bajo el mismo criterio. Véase Admor. F.S.E. v. Almacén Ramón Rosa, supra, pág. 720 y casos allí citados. Al ser así, ambos tipos de prueba son factibles para probar un hecho ya sea en un litigio civil o uno de índole criminal, y añadimos, en la esfera administrativa. Id., pág. 720. Dentro de esta perspectiva, contestemos la interrogante de si se llegó a establecer un caso prima facie en contra de los recurridos.

Durante la vista administrativa de este caso únicamente se presentó prueba testimonial. La misma consistió en los testimonios de los cazadores recurridos y el testimonio del vigilante Rivera, quién atestiguó por parte del DRNA.

Si bien la prueba que allí se presentó apoyó la conclusión de que los vigilantes intervinieron con los recurridos en la finca Toro, entendemos que esta no fue suficiente para poder dictaminar que los recurridos cometieron la infracción de cazar ilegalmente en ese lugar.

El DRNA tenía obligación de demostrar, ya fuera mediante evidencia directa o evidencia circunstancial, que los recurridos cazaron en la finca Toro. Durante la vista no se presentó evidencia directa sobre ese particular, pues el propio vigilante Rivera atestó que no vio a los recurridos "matar ningún animal".[34] Por tanto, la evidencia que presentó el DRNA en cuanto a esto fue más bien circunstancial y consistió en el testimonio de este mismo vigilante a los efectos de que encontró a los recurridos en la finca Toro, con armas de caza y con ciertas presas. Por su parte, en todo momento durante la vista administrativa estos últimos indicaron que estuvieron cazando en la finca Ruiz y que solo pasaron a la finca Toro para recoger el producto de la caza. Conforme a lo anterior, entendemos que la prueba circunstancial ofrecida por el DRNA no es suficiente para que se sostengan las multas expedidas en contra de los recurridos por haber cazado en la finca Toro sin permiso de su dueño, pues la misma no está apoyada por otra prueba que nos lleve a concluir razonablemente que ello ocurrió así y no existe en el expediente otra evidencia sustancial

---

[34] Transcripción de la vista administrativa del 29 de mayo de 2011, CD # 2, pág. 26. Petición de *certiorari*, pág. 512.

que apoye una determinación contraria a esta. En conclusión, al examinar la transcripción de la vista administrativa observamos que la prueba presentada por el DRNA no constituyó "evidencia sustancial" en cuanto a las faltas que se les imputaron a los recurridos.

El análisis que precede nos conduce a modificar la sentencia del Tribunal de Apelaciones en cuanto a que los cazadores no poseían legitimación para impugnar la entrada de los vigilantes a la finca Toro Farms ya que dicha defensa opera en función de la expectativa razonable de intimidad o el interés personal que estos tuvieran sobre esa propiedad, cosa que no se logró establecer en este caso. Por otro lado, aunque por distintos fundamentos, sostenemos la determinación del foro intermedio referente a que en el expediente administrativo no obró prueba sustancial que sostuviera la validez de las penalidades emitidas contra los recurridos.

IV

Por los fundamentos antes expuestos, se modifica la sentencia del Tribunal de Apelaciones para disponer que los recurridos no tienen legitimación para solicitar el archivo de las faltas administrativas fundamentándose en una violación al derecho constitucional que prohíbe los registros y allanamientos irrazonables. Esto así, toda vez que no poseían una expectativa razonable de intimidad ni interés alguno sobre la finca allanada. Así modificado, se confirma el dictamen recurrido.

Se dicta sentencia de conformidad.


                        Edgardo Rivera García
                           Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |  |
|---|---|---|
| Alberto L. Acarón Montalvo, Carlos R. Wiscovitch Teruel<br><br>Recurridos<br><br>v.<br><br>Departamento de Recursos Naturales y Ambientales<br><br>Peticionarios | | Certiorari<br><br>CC-2011-0523 |

SENTENCIA

En San Juan, Puerto Rico, a 28 de agosto de 2012.

Por los fundamentos antes expuestos, se modifica la sentencia del Tribunal de Apelaciones para disponer que los recurridos no tienen legitimación para solicitar el archivo de las faltas administrativas fundamentándose en una violación al derecho constitucional que prohíbe los registros y allanamientos irrazonables. Esto así, toda vez que no poseían una expectativa razonable de intimidad ni interés alguno sobre la finca allanada. Así modificado, se confirma el dictamen recurrido.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton concurre con la siguiente expresión: "El Juez Presidente señor Hernández Denton está de acuerdo con dejar sin efecto las multas impuestas. Sin embargo, concurre por entender que, en este caso, la evidencia que obra en el expediente no es suficiente para establecer que los cazadores recurridos estaban practicando el deporte de caza en el lugar donde se les imputa haberlo hecho. Por consiguiente, cualquier discusión sobre la expectativa de intimidad de los recurridos resulta especulativa". La Juez Asociada señora Rodríguez Rodríguez concurre con la siguiente expresión: "La Juez Asociada señora Rodríguez Rodríguez

concurre con el resultado porque entiende que el Estado no logró probar que los recurridos se hallarán cazando sin autorización del dueño en la propiedad del señor Milton Toro.   Una vez determinada la carencia de evidencia sustancial que hubiese permitido sostener las multas considera que los pronunciamientos sobre la legitimación de los recurridos para impugnar los boletos son innecesarios".   La Juez Asociada señora Fiol Matta disiente sin opinión escrita.


                        Aida I. Oquendo Graulau
                     Secretaria del Tribunal Supremo